## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DANIEL A. MARTINEZ,

        Plaintiff,

v.                              No. CIV 09-729 JAP/LFG

MICHAEL J. ASTRUE,
Commissioner of Social Security
Administration,

        Defendant.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

Plaintiff Daniel A. Martinez ("Martinez") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner").  The Commissioner determined that Martinez was not eligible for supplemental security income benefits ("SSI").   Martinez moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing.  [Doc. 16.]

## Background

Martinez was born on June 20, 1955, and was 54 years old at the time of the administrative law hearing. [AR 71, 107, 341, 342.] Martinez is a veteran and appears to have been in the army

---

[1]**Within fourteen (14) days after a party is served with a copy of this analysis and recommendation, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendation.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the analysis and recommendation.  If no objections are filed, no appellate review will be allowed.**

national guard from 1975-1981.[2] [AR 91, 92, 110.] Martinez worked as a landscaper and in construction "off and on" for a number of years but never held any employment long enough to be considered "past relevant work." [AR 117, 133.] Martinez's earnings records from 1982-2007 show that he had almost no income. The most money he earned in those years was $3530 in 1987. From 1972-1980, he earned $3500 or less annually. [AR 57, 88.]

Martinez has often been homeless and lived in shelters or on the street. [AR 119, 193, 194, 205, 216, 342.] Most records indicate he was never married, but more recent records refer to a "wife" who left him. [AR 107, 324, 333.] Martinez has three children, with whom he has no contact. [AR 260.] He was convicted of at least two felonies [AR 289] and spent a number of years in prison.[3] [AR 71, 75, 108, 134, 135.] He completed the 10th or 11th grade and obtained his G.E.D. while incarcerated. [AR 142, 199, 260, 344-45.]

On October 24, 2005, Martinez filed an application for SSI benefits, alleging an onset date of April 1, 1989. [AR 107.] He contended he could not work because of depression and lack of concentration. More specifically, the illnesses that prevented him from working were bipolar disorder, anxiety, Methadone treatment, and removal of his left kidney. He stated that his ability to concentrate was not good and that he suffered from "really bad" anxiety attacks. One minute his moods were "real cool" and the next minute, he became angry. [AR 132.] His symptoms began as

---

[2]Martinez is not a good historian. Many discrepancies exist in the administrative record, including the years of his military service. One record states that Martinez was in the army national guard from 1975-1981 [AR 110]; another states that he served in the army national guard from 1986 to 1992 and was honorably discharged. [AR 260.]

[3]Again, the records are not clear as to what years Martinez spent in prison or of what crimes he was convicted. [AR 71, 75.] At the hearing, Martinez testified that he went to prison in the 1990's for sleeping inside a car and being charged with auto burglary. [AR 354.] It appears that he was incarcerated at Los Lunas Central Correctional Facility from August 2001 until September 2005. [AR 108.] One record notes that he was in Lea County Correctional Facility in Hobbs, New Mexico from 1999 to 2004, and in Metropolitan Detention Center from 1992-2001. [AR 134.]

early as January 1, 1989, but he claims to have become disabled as of April 1, 1989, even though

he worked off and on until 1993. [AR 132.]  His application for benefits was denied initially and on

reconsideration. [AR 10.]

On July 25, 2008, the ALJ held a hearing, at which Martinez was present and represented

by counsel.  [AR 340.]  In a decision, dated August 28, 2008, the ALJ found that Martinez was not

eligible for SSI benefits during the applicable period, *i.e.,* from September 30, 2005 (or October

2005) (date application was filed) through August 28, 2008 (date of decision).  [AR 19.]  On June

25, 2009, the Appeals Council denied Martinez's request for review, after considering additional

records that were submitted. [AR 3-6.]  This appeal followed.

### Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation

process.[4]  The burden rests upon the claimant to prove disability throughout the first four steps of

this process, and if the claimant is successful in sustaining his burden at each step, the burden then

shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines

that the claimant is or is not disabled, the evaluation ends.[5]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in

substantial gainful activity;[6] at step two, the claimant must prove his impairment is "severe" in that

it "significantly limits his physical or mental ability to do basic work activities . . . .;"[7] at step three,

the Commissioner must conclude the claimant is disabled if he proves that these impairments meet

---

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[5]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[6]20 C.F.R. § 404.1520(b) (1999).

[7]20 C.F.R. § 404.1520(c) (1999).

or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[8] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[9]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[10] age, education and past work experience, he is capable of performing other work.[11]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[12]

### Standard of Review

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v.

---

[8]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[9]20 C.F.R. § 404.1520(e) (1999).

[10]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[11]20 C.F.R. § 404.1520(f) (1999).

[12]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

4

Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

### ALJ's Written Decision

After reviewing Martinez's testimony, medical records, symptoms, and complaints, the ALJ determined that Martinez was under a disability but that a substance abuse disorder was "a contributing factor material to the determination of disability."  Accordingly, the ALJ denied Martinez's application for SSI. [AR 10.]

More specifically, the ALJ made the following findings: Martinez had not engaged in substantial gainful activity since September 30, 2005, the application date; he had severe impairments consisting of IV drug addiction (currently in Methadone maintenance program);

5

alcohol abuse, personality disorder with antisocial traits, depression and anxiety disorders; Martinez's impairments, including the substance use disorders, met listings 12.09, 12.04 and 12.06; if Martinez ceased his substance abuse, the remaining limitations would cause more than a minimal impact on his ability to perform basic work activities; thus, Martinez would continue to have a severe impairment or combination of impairments; if Martinez stopped the substance abuse, he would not have an impairment or combination of impairments that met or equaled any listing; "if he stopped the substance use, [Martinez] would have the RFC to perform a limited range of light work with moderate limitations in interaction in appropriate manner and unable to perform work focusing upon interactions with others" [sic?]; Martinez had no past relevant work; he was closely approaching advanced age; he had at least a high school education; transferability of job skills was not an issue; and, if Martinez stopped substance use, considering his age, education, work experience, and RFC, there would be a significant number of jobs in the national economy he could perform.[13] [AR 10-19.]

---

[13]The parties dispute who bears the burden of proof at step five of the sequential evaluation.  Typically, the social security opinions from this district use the following boilerplate language: "[a]lthough the claimant generally continues to have the burden of proving disability at [step five], a limited burden of going forward with the evidence shifts to the Social Security Administration." [RP 12.] After conducting a Westlaw search of this phrase, the Court observes that the same language often appears in decisions by federal courts in the Middle District of Florida and Central District of California.  In contrast, the Tenth Circuit states: "The claimant bears the burden of establishing a prima facie case of disability at steps one through four. If the claimant successfully meets this burden, at step five the burden of proof shifts to the Commissioner to show that the claimant retains sufficient RFC to perform work in the national economy, given his age, education, and work experience.  In the present case, the Commissioner reached his decision at step five and therefore bore the burden of proving [the plaintiff's] ability to work."  *See, e.g.,* Jeffries v. Social Security Admin., 2009 WL 4918255, at * 1 (10th Cir. Dec. 22, 2009) (unpublished opinion) (internal citations omitted).  *See also* Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005) (noting that the claimant must show his impairments prevent him from performing his past work, and then the burden shifts to the Commissioner to show that the claimant can perform work in the national economy); Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987) (Plaintiff bears the burden of persuasion through step four, while at step five the burden shifts to the Commissioner). The Commissioner should revise its boilerplate language accordingly as to the burden of proof at step five.

<u>**Summary of Martinez's Medical Condition and Treatment**</u>

<u>***2005 Records***</u>

Martinez's medical records begin in September 2005, apparently when he was released from prison.  There is a letter, dated September 23, 2005, from a mental health clinician with the State of New Mexico Corrections Department, addressed to whom it may concern. [AR 72.] That letter states that Martinez was being paroled, did not have any employment or income, and needed assistance.  He had a history of "mental health involvement, including the use of psychotropic medications."   He also had a history of major depression, in remission, and a past history of substance use, "usually due to depression."  He was being paroled to his aunt's or uncle's home in Denver, Colorado. [AR 72.] He had been incarcerated since August 2001. [AR 75.]

On September 29, 2005, an "initial medical examination" was performed by the Colorado Department of Human Resources. [AR 236.] The psychiatric nurse, Patricia Hamilton, checked a box indicating that Martinez could not perform any job for a total of six months or more due to a physical or mental impairment that was disabling.  His diagnoses were bipolar mood disorder and anxiety disorder. [AR 237.] Nurse Hamilton predicted that his disability would last 9-11 months, although she had the option to mark the box stating the disability would last 12 months or more. The record notes that Martinez had sleep problems.  He needed to manage his anxiety symptoms and improve his depressed mood, concentration and motivation.  He had a history of mood instability and depression with significant anxiety.  Martinez had responded positively to medical management in the past but he had had significant psycho-social stressors.  They would need time to find an effective treatment plan. [AR 237.]

A medical record, dated October 3, 2005, notes that Martinez was staying with his uncle and that he was a veteran without any benefits or insurance.  He was taking Trazodone (sleep

medication; anti-depressant) and Klonopin (a benzodiazepine used to treat anxiety). [AR 290.] Another progress note, dated October 3, 2005, indicates Martinez was taking Seroquel.[14] There were no changes in his symptoms.  His worst symptoms were anxiety, depression, sleep problems and racing thoughts.  He was not suicidal.  He appeared restless, agitated, depressed and anxious. Martinez said he felt like drinking and requested a refill for Klonopin. The nurse at the Stout Street Clinic noted diagnoses of mood disorder, NOS, and wished to rule out "APD" (presumably a personality disorder).  Martinez was prescribed Depakote[15] and Amitriptyline.[16]  The nurse noted "no benzos," apparently meaning she would not prescribe Klonopin. [AR 288.]

On October 24, 2005 (the ALJ indicates a date of September 30, 2005), Martinez filed an application for SSI benefits.  The onset date was April 1, 1989.  The application form indicates Martinez had never been married.  He used food stamps and did not contribute to household expenses. [AR 107, 109.] There is a notation on one form that Martinez had a prior suicide attempt. [AR 115.] Another record indicated that Martinez might be eligible for benefits from the national guard.  However, it does not appear from the administrative record that he received any benefits related to military service. [AR 92, 96.]

---

[14]Seroquel "is used with or without other medications to treat certain mental/mood conditions (such as depression, bipolar disorder, schizophrenia). Quetiapine is known as an anti-psychotic drug (atypical type). It works by helping to restore the balance of certain natural chemicals (neurotransmitters) in the brain.  This medication can decrease hallucinations and improve your concentration. It helps you to think more clearly and positively about yourself, feel less nervous, and take a more active part in everyday life. Quetiapine can help prevent severe mood swings or decrease how often mood swings occur."  www.webmd.com

[15]Depakote "is used to treat seizure disorders, certain psychiatric conditions (manic phase of bipolar disorder), and to prevent migraine headaches. It works by restoring the balance of certain natural substances (neurotransmitters) in the brain."  www.webmd.com

[16]Amitriptyline "is used to treat mental/mood problems such as depression. It may help improve mood and feelings of well-being, relieve anxiety and tension, help you sleep better, and increase your energy level." www.web.com

There is an undated disability report showing Martinez was living in Denver.  The illnesses that prevented him from working were "bipolar, anxiety, Methadone, left kidney removed." [AR 131.] He first had symptoms in January 1989 although he continued to work off and on up to 1993. This record discusses some of the dates of Martinez's incarceration.  He noted on this record that he was stabbed in the head in the early 1980's.  He suffered from bad headaches and had a seizure one day while working in prison.  He could not tolerate being around people. [AR 138.] No medical records from prison are part of this administrative record.

On November 4, 2005, a note from the Colorado Homeless organization indicates diagnoses of bipolar disorder and anxiety.  Martinez was "neat, fully oriented" and engaged in normal physical activity.  He had "changing facial expressions" and appeared sad.  He had been convicted of two recent felonies and knew that obtaining housing might be difficult. [AR 289.]

### *2006 Records*

On January 18, 2006, Martinez indicated he could read, exercise, do yardwork, and perform work activities prior to suffering impairments.  But, he had headaches and constant pain. [AR 150.] He could take care of his personal needs and prepare a few meals a week.  He washed dishes and made the bed.  His uncle helped him with his medications. [AR 151.] He went out once a day and walked but did not drive.  He could not take care of finances and tended to forget to pay his bills. [AR 152.] Martinez watched television and tried to read. [AR 153.] He did not spend time with people and had no social life. [AR 154.] He had problems bending, standing, climbing stairs, completing tasks, concentrating, understanding, following instructions and getting along with others. [AR 154.] He could concentrate for about 15 minutes but could not remember written instructions. He felt paranoid and anxious when around many people. [AR 155.] He had been seeing a psychiatrist for seven years, but it is not clear what psychiatrist Martinez saw or whether this was

9

a doctor in the prison system.  He was taking or had taken Prozac, Lithium,[17] Paxil[18] and Trazodone.
[AR 156.]

On January 19, 2006, Martinez filled out a pain questionnaire related to his SSI application.
[AR 147.] Pain interfered with his ability to concentrate and he was very forgetful.  He had to cease
all activities and could not be around people because of noise.  His pain, which apparently related
to "severe headaches," interfered with his sleep.  Martinez suffered from pain 4-6 hours a day, and
was taking Seroquel, Amitriptyline, Depakote and Trazodone. [AR 148.]

On February 28, 2006, Brett Valette, Ph.D. performed a consultative psychological
evaluation.  Martinez grew up in New Mexico.  When he was 10 years old, he witnessed his father's
suicide.  Martinez reported he was diagnosed with bipolar disorder in prison in 1996, although there
are no contemporaneous medical records.  He felt anxious and was depressed all of the time.  He had
his left kidney removed in the 1970's but did not why.  He was stabbed once in the head but the knife
did not pierce his skull.  Martinez complained of a seizure disorder.  However, he was unable to
describe the seizures, other than to state the seizures started in prison in 1998, and the last one
occurred in July 2005.  He was unable to work because he was depressed and could not concentrate.
[AR 260.]

Martinez's daily activities included eating meals, cleaning house, washing dishes, throwing
out trash, going for a walk, vacuuming, doing laundry, shopping and watching some television.  He
did not like to be around many people.  At first, he said he did not have any friends but then agreed

---

[17]Lithium "is used to treat manic-depressive disorder (bipolar disorder). It works to stabilize the mood and
reduce extremes in behavior by restoring the balance of certain natural substances (neurotransmitters) in the brain."
www.webmd.com

[18]Paxil or "Paroxetine is a selective serotonin reuptake inhibitor (SSRI) used to treat depression, panic
attacks, obsessive-compulsive disorder (OCD), anxiety disorders, post-traumatic stress disorder, and a severe form
of premenstrual syndrome (premenstrual dysphoric disorder)."  www.webmd.com

he had one or two friends. [AR 260-61.] His driver's license had expired and he did not renew it. [AR 261.]

During the consultative exam, Martinez initially denied any alcohol or drug use, but then said he smoked marijuana and quit " a few years ago." He had tried acid once in the 1970's. [AR 261.] He admitted he was arrested on two occasions for dealing drugs.

Martinez was taking Risperdal,[19] Amitriptyline, Depakote and Advair. The psychologist described him as cooperative, polite, pleasant, and having good eye contact. His behavior was appropriate and his speech was clear, although a little hesitant. Martinez stated he was depressed and cried easily but did not know why. He was irritable and tended to get angry a lot. He was depressed in prison. He felt hopeless and worthless and did not think the medications were helping him. Right after his prison release in 1998 and 2000, he attempted to overdose using pills. He was not currently suicidal. His appetite varied and he had lost a lot of weight.

The psychologist diagnosed him with cannabis abuse, "full remission by patient report," major depression, generalized adjustment disorder, nonspecific personality disorder, seizure disorder, "by patient report." His psycho-social stressors were mild to moderate. Dr. Valette assessed Martinez with a GAF of 60 and concluded he should be able to manage his own funds. Martinez was focused and paid attention during the evaluation. His short term memory was fine; his general fund of information was below average. His ability to understand abstractions was fine but he could not understand the proverb. He had difficulty adjusting in society and had antisocial

---

[19]Risperdal or "Risperidone is used to treat certain mental/mood disorders (schizophrenia, manic phase of bipolar disorder, irritability associated with autistic disorder). This medication can help you to think clearly and function in daily life." www.webmd.com

personality traits.  He had been arrested two times and said he had sold drugs for many years.  The psychologist did not see any evidence of bipolar disorder. [AR 262.]

On March 1, 2006, Dr. Laura Moran performed a consultative physical examination. [AR 267.] Martinez noted a history of bipolar disorder and anxiety, but Dr. Moran stated she would not address these problems further since because of his appointment with Dr. Valette, a clinical psychologist.  Martinez reported he had a kidney removed in 1976 but he did not know the reason for the surgery.  He had suffered from headaches three times a week since 1996.  He had a head injury as a youngster.  He also reported a seizure disorder since July 2005, but Dr. Moran did not see this diagnosis in his medical record.  Martinez explained he had had three seizures in prison and that he was taking Depakote for mood disorders and seizures.  He was not able to describe the seizures.  Martinez was diagnosed with hypertension but was not taking medications.  He occasionally had chest pain.  He stated he last worked in 2000 before he was incarcerated for dealing drugs.  He drank a few beers on the weekend, had used marijuana in the past, and had not used street drugs.  He was taking Amitriptyline, Depakote and Advair. [AR 268.] He weighed 139 pounds.

Dr. Moran observed that Martinez's gait was normal.  He could squat and bend.  His strength was normal.  An echocardiogram was normal.  His history of seizures was unconfirmed.  He was "normotensive today" and not taking any medications for hypertension.  He could sit, stand and walk without limitations.  He could lift and carry without restrictions.  He was able to hear, speak and travel.  The only limitation Dr. Moran considered was based on the possibility of a seizure disorder that needed to be more fully explored.  Until then, Martinez should not drive or look down from heights.  Other than that, she assessed no physical limitations. [AR 270.]

On March 8, 2006, a Psychiatric Review Technique form was filled out, noting that an RFC assessment was necessary.  Dr. Garnand checked off 12.04 (affective disorders), 12.06 (anxiety-

related disorders), and 12.09 (substance addiction disorders).  Martinez had major depression but it did not precisely satisfy the diagnostic criteria for listing level. [AR 244.] The same was true with respect to Martinez's anxiety and cannabis abuse.  With respect to the "B" criteria for listings, Martinez's limitations in performing daily activities were mild; his limitations in maintaining social functioning were moderate, and his limitations in the ability to concentrate were mild. [AR 251.] Dr. Garnand also summarized the findings from the consultative exams. [AR 253.]

On the March 8, 2006 mental RFC assessment form, Dr. Garnand found moderate limitations in Martinez's ability to understand, remember detailed instructions, and carry out detailed instructions. [AR 255.] He also found moderate limitations in Martinez's ability to work with others without becoming distracted.  Dr. Garnand did not find a marked limitation in any category.  There were moderate limitations in Martinez's ability to interact appropriately with the general public, accept instructions and criticism and to get along with others without distracting them.  Dr. Garnand found few or no limitations in all other categories. [AR 256.] He stated that Martinez was "capable of work of limited complexity but which requires accuracy and attention to detail; cannot work closely with supervisors or coworkers; can accept supervision and relate to coworkers if contact is not frequent or prolonged; must have minimal to no interaction with the general public." [AR 257.]

The March 2006 vocational worksheet indicates that the SSA found Martinez was not disabled and that he could do unskilled work dealing with things not people, *e.g.,* wire winding machine operator, rubber cutting machine tender, and sugar chipper machine operator. [AR 143.] His SSI application was denied. [AR 28, 50, 157.]

On May 18, 2006, Diane Ortiz, a social worker with Ayudantes, Inc. (near Española, New Mexico),[20] wrote DDS a letter on behalf of Martinez, noting his appeal deadline was May 20, 2006, but that she just began working with him on May 9.  She sought an extension to file an appeal as she still needed to obtain medical records.  [AR 45.] Ms. Ortiz was appointed as a non-attorney representative on June 9, 2006. [AR 46.]

On June 9, 2006, Martinez reported that he had been very depressed and stressed out because he had no income and no insurance for medical treatment.  He was not stabile on his medications. He felt hopeless and helpless at times and like "doing something to end all the depression and bad feelings."  He felt he should be in an inpatient facility for depression and stress so that he could get stabilized.  Martinez needed help for his bipolar disorder and mood swings.  He felt very sad and cried a lot.  He had seen beatings and rapes in prison.  Martinez, at age 10, witnessed his father shoot himself in the head.  He also witnessed 3-4 murders in prison and 2 in county jail.  Martinez heard voices and suffered from panic attacks.  He had bad headaches 3 times a day or more.  He lost custody of his children due to his incarceration. [AR 159.] In jail, he had spent a lot of time in solitary confinement. [AR 159.]

On June 9, 2006, Ms. Ortiz wrote a letter to the SSA, stating that Martinez's ability to function had decreased due to his illnesses. Ms. Ortiz requested social security benefits for Martinez to help him stabilize.  He suffered from PTSD, bipolar disorder, Hepatitis C, removal of one kidney due to a stab wound, frequent migraine headaches, and psychotic disorder NOS.  He heard a lot of voices that caused him severe distress.  Martinez was in "dire need" of medications but Ayudantes had no psychiatrist to evaluate him or prescribe appropriate medications.  Martinez was attempting

---

[20]Martinez apparently had moved to the Espanola area.

to obtain some medications through the Colorado Coalition for the Homeless.  He was taking Klonopin, Depakote, Risperdal, and Amitriptyline.  Ms. Ortiz wrote that Martinez was unable to take his medications because he had no money.  His aforementioned illnesses and mental disorders caused him significant distress and affected his functional ability.  Ms. Ortiz asked the SSA to reconsider his disability "status" for benefits. [AR 234.]

There are several progress notes by healthcare providers with Albuquerque Healthcare for the Homeless.  A July 13, 2006 record indicates that Martinez slept on the street last night.  He weighed 109 pounds.  He requested prescription refills, including one for Klonopin.  St. Martin's Hospitality Center in Albuquerque was willing to pay for a one-month prescription.  He was taking Risperdal, Depakote and Amitriptyline.  Martinez was assessed with bipolar affective disorder, mixed and PTSD, chronic.  He reported having a seizure disorder from about 1998.  His last seizure occurred in 2006.  He thought Depakote worked to reduce his mood swings, anger and irritability.  He also had auditory hallucinations when he heard his dead brother speaking.  Last night, he felt he was being followed.  A prescription was written for Klonopin.  He had been given a medical bed at Good Shepherd for two days due to an injury to his left knee.  Martinez stated he would continue to see Dr. Winslow at St. Martin's as his "psych provider." [AR 205.]

A July 13, 2006 letter to Healthcare for the Homeless from S. Brooks Bedwell, a program manager with St. Martin's, states that Martinez needed medications for his mental health diagnoses, including bipolar disorder, PTSD and acute anxiety with panic attacks.  Martinez had no income and St. Martin's had helped him connect with the UNM Business Office for a financial assistance appointment.  St. Martin's wondered if it was possible for Healthcare for the Homeless to provide him with prescriptions for Risperdal, Elavil and Depakote.  If Healthcare for the Homeless wrote

15

a prescription for Klonopin, St. Martin's would fill the prescription for one month until he could obtain assistance through UNM. [AR 207.]

On July 14, 2006, a record indicates Healthcare for the Homeless received a telephone call from Good Shepherd stating that Martinez was barred from receiving a referral for a medical bed for six months because he was unwilling to remain in the shelter. [AR 204.]

On July 17, 2006, Martinez requested an ALJ hearing.

On July 24, 2006, Healthcare for the Homeless received a telephone call stating Martinez had been caught lying about his prescription for Klonopin. [AR 204.] On July 28, 2006, Martinez was seen at Healthcare for the Homeless. His moods were fluctuating. He was angry and sad. He suffered from auditory hallucinations, nightmares and flashbacks. A side effect of Risperidone (Risperdal) was restless legs. Trazodone caused throat swelling. He wanted to get a bed at Albuquerque Opportunity Center ("AOC"), which was owned and operated by Metropolitan Homelessness Project, and operated as an emergency shelter and services center for homeless men. Martinez also requested Klonopin. He presented with a "restricted affect" and anger. He made eye contact, his speech was coherent, and his thoughts were organized. He had a left knee scrape with drainage at the center. Martinez was assessed with bipolar affective disorder, mixed and PTSD, chronic. He was referred for case management and therapy and given contact information for AOC. The nurse practitioner refused to give Martinez any Klonopin. [AR 202-03.]

On August 4, 2006, there is a record indicating Martinez was represented by counsel with respect to his SSI application. [AR 164.] On August 23, 2006, Martinez did not show up for his psychological consultation at Healthcare for the Homeless. [AR 211.] There are no other records for 2006, and actually none until June 2007. [AR 124.]

16

### *2007 Records*

There is a disability report appeal in the record, dated June 28, 2007. [AR 124.] However, it is not clear if this is the date the report was submitted.  It may have been submitted closer to June 2006.  This form still contains Diane Ortiz's name as Martinez's representative (or social worker), but an attorney had requested she (the attorney) be permitted to representative Martinez in August 2006.  This form shows that the last disability report was filed October 24, 2005.  Martinez's conditions had declined since then because he could not afford his medications.  He was unable to work due to mental and physical conditions.  He stated his condition changed on about April 1, 2006.  His new limitations included a mood disorder.  His mood could change at any time, and he felt hopeless and helpless.  Martinez's memory was worse due to traumatic brain injury and multiple stab wounds to the head from May 2006. [AR 124.]

Martinez was seen for a heart murmur although there are no contemporaneous medical records to confirm this condition.  He was taking Amitriptyline for "bipolar/mood swings," Depakote for bipolar disorder, Klonopin for anxiety and Risperdal for depression. [AR 127.] Because of Martinez's head injury, he forgot to take his medications at times and forgot to eat.  [AR 128-29.]

The only other record from 2007, was an initial medical exam, dated October 3, 2007, by psychiatric nurse practitioner Patricia Hamilton in Denver.[21] [AR 118.] Ms. Hamilton certified that Martinez was disabled or unable to work any job for a total of 6 months or more due to a physical or mental impairment that was disabling. [AR 118.] He was diagnosed with a mood disorder, NOS, and a psychotic disorder, NOS. [AR 119.] The expected length of the disability was 9-11 months,

---

[21]It is unclear why this record was filled out by Nurse Hamilton in Denver as of this date when it appears that Martinez was living in New Mexico.  This record is very similar to one from 2006.

although Ms. Hamilton could have checked the box– "12 months or longer." Ms. Hamilton wrote that from 1996 to present, Martinez was diagnosed with bipolar disorder ("patient's account"). "Patient was involved in a riot experience in prison which contributed to a worsening of mood symptoms with severe anxiety symptoms. Pt. states sobriety for 6 years . . . ." He was apparently homeless at this time or had been. [AR 119.]

### *2008 Records*

In 2008, Martinez was taking Depakote for bipolar disorder, Risperdal for auditory hallucinations, Seroquel for bipolar disorder, and Trazodone for insomnia. He also took Klonopin for anxiety and Methadone for his addictions. It appears that he began taking Methadone in 2007 or 2008, although there are no records indicating when he began Methadone treatment. [AR 116.]

On January 11, 2008, Martinez was seen by Dr. Strassman at Ayudantes in Española, New Mexico. [AR 216.] He was living between a Santa Fe shelter and his brother's home in Española. He had moved from Colorado and had been in New Mexico for about a month.[22] He stated he had been assigned a judge for his SSI hearing but did not have a hearing date. He was not sleeping well. Martinez was "vague" about his jail time and drug use. He had had two bipolar-related hospitalizations, one for mania and one for adverse interactions of alcohol and VPA (valproic acid is a commonly prescribed anti-epileptic drug). [AR 216.] Martinez had overdosed two times which probably led to his psychiatric hospitalizations.

Martinez was taking VPA, Risperdal, Amitriptyline, and Klonopin. He believed the medications helped him. He described having been in prison riots in Hobbs and in Santa Fe.[23] He

---

[22]Records from 2006 indicate Martinez was in New Mexico.

[23]The New Mexico prison riots occurred in early February, 1980. Martinez later represented that he was incarcerated in 1999 and remained there through about 2002. Thus, it does not appear accurate that he was at the New Mexico State Penitentiary at the time of the riot. [AR 353-54.]

suffered from flashbacks and nightmares.  He had been depressed and cried a lot.  Martinez had tried various medications, including Trazodone, Remeron, Prozac, Paxil, Lithium, Tegretol, and Trileptal. It is not clear from the record when he was prescribed all of these medications or how long he took them.

Martinez had lost 40 pounds in the last years due to decreased appetite.  He was not suicidal at this time, but mentioned two overdoses in 1989 and 1990.  He stated he used IV drugs and had been on Methadone for seven months.  He claimed it had been 8 years since he used IV drugs.  He denied having Hepatitis or HIV, although later records indicate he had Hepatitis C.  Martinez previously smoked marijuana.  He suffered from frequent panic attacks and fled from busses when he could not sit alone.  He claimed to have had seizures after being stabbed in the head.  He had taken Dilantin and Phenobarb but was not taking those drugs at this time.  An MRI revealed an old occipital bleed.  He mumbled slightly when he spoke perhaps because of missing many teeth.  He had poor eye contact and some body odor.  He was slightly depressed.  Martinez was oriented and had average intelligence.  His insight and judgment appeared good.  He was diagnosed with bipolar disorder "by history."  He was mostly depressed.  Dr. Strassman noted polysubstance abuse/dependence in an unknown state, PTSD by history, panic disorder with agoraphobia, and psychosis, "need better clarification."  Martinez received a GAF of 50.  Dr. Strassman gave him some sample medications and a prescription for Klonopin. [AR 216-17.]

On February 1, 2008, Martinez again saw Dr. Strassman.  Martinez had been picked up for an outstanding traffic ticket and sent to jail in Gallup where he stayed 3-4 days.  While incarcerated, he did not receive any of his medications except on one morning, and his medications were not returned to him. [AR 215.]  He had not taken any medications for two weeks.  He complained that

his prostate symptoms were returning, and he wanted a prescription for Terazosin.[24]  He noted he had a social security hearing soon and that Attorney Martone was working with him.  He claimed to be clean and sober, but felt poorly.  Dr. Strassman wrote him a prescription for Klonopin and gave him some samples.  [AR 215.]

On March 7, 2008, Martinez reported to Dr. Strassman that he had been working in a senior center kitchen to satisfy his 50 hours of community service and enjoyed the work.  He was staying with a cousin in Española as his brother there was drinking too much.  Martinez claimed not to be taking drugs or drinking.  He was taking Risperdal and doing fine on it.  The Amitriptyline caused "dry mouth."  He had taken Trazodone in the past and was willing to try it again.  He still needed to bring in proof that he had no income in order to send out applications for "PAP" (public assistance?).  Dr. Strassman noted that he was pleasant but also questioned on the progress note: "smells a little of alcohol?" [AR 214.]

On April 2, 2008, Dr. Strassman wrote a prescription for Klonopin. [AR 213.] On April 24, 2008, Dr. Strassman wrote him prescriptions for Klonopin, Trazodone, Risperdal and Depakote. [AR 212.]

On June 3, 2008, Martinez was voluntarily admitted to UNMH and UNM Psychiatric Center, where he stayed several days. [AR 324.] He was described as homeless and having diagnoses of bipolar disorder and opioid dependence.  He was transferred from "ED" after a suicide gesture. [AR 324.] He reported worsening depression "since he lost his job and his wife left him 2-3 months ago. He also became homeless at that time."  There are no other records indicating Martinez was

---

[24]Terazosin is used to treat high blood pressure. It works by relaxing blood vessels so blood can flow more easily.  "This medication is also used to treat an enlarged prostate (benign prostatic hyperplasia or BPH) in men." www.webmd.com

employed, had married, or had a home.  On the day of his hospital admission, Martinez reported he was accused of stealing a bowling ball but denied it.  However, he had been drinking.  He felt "overwhelmed by a desire to die, and cut himself with his own knife."  He was taken back to ED, where he again attempted to cut himself.  His urinary toxicology was positive for cocaine, Methadone and benzodiazepines.  Upon being discharged to "PES," Martinez became sober but continued to feel suicidal with a plan to cut himself.

Martinez complained of increased depression and reduced sleep, decreased appetite and motivation, and a sense of helplessness. [AR 324.] He denied other substance abuse except Methadone maintenance that he received from the Metamorphosis Clinic in Albuquerque.[25]  He denied symptoms of mania or psychosis.  He claimed his psychiatric medications were stolen one week ago and that he had not been able to take any medications except some Klonopin that he bought on the street. [AR 324.] He had been diagnosed with bipolar affective disorder.  He reported previous suicide attempts but denied prior hospitalizations.  He recently had a prescribing doctor in Las Vegas, New Mexico and a "Dr. Mirin" at an unknown clinic.  This record states that Martinez had been employed recently as a landscaper but quit his job and lost his wife and home a few months ago.  He had children from another marriage but was not currently in contact with them.

Martinez was recently accused of stealing with no known charges pending.  He had a burglary conviction with jail time.  His substance abuse history states: heroin - not in 1 year; etoh (alcohol) "not often." [AR 324.] He was positive for hepatitis C.  He lost a kidney because of stab wound.  He had an intracranial stab wound, a history of three seizures status post head injury, and asthma.  [AR 325.] He had a laceration in his left forearm and abrasions.  Martinez appeared

_____

[25]This is obviously untrue.  He was admitted to the hospital with a diagnosis of opiate dependency.  He tested positive for cocaine and benzodiazepines.

21

"disheveled, frail, . . . looking tired." He was cooperative but difficult to understand. His mood was "bad." [AR 325.]

Martinez's neurological exam was "grossly intact." The impression was history of bipolar affective disorder, opioid dependence on maintenance, with recent stressors of homelessness, loss of wife, home and job, off medications for one week, alcohol relapse, accusation of legal charges precipitating worsening depression with suicidal intention, and a plan to cut himself. Even with sobriety, Martinez still wanted to die and planned to cut himself. Therefore, he would benefit from voluntary hospitalization and stabilization. [AR 326.]

At times during his hospitalization, Martinez was hostile and angry and isolative. [AR 332.] His suicidal ideation continued. [AR 332, 33.] He had a history of IV heroin addiction although he claimed not to have used heroin in one year. None of the earlier records indicated heroin use. Later on June 3, Martinez's feelings of self harm had lessened but were not gone. [AR 328.]

On June 4, 2008, Martinez collapsed in the hospital unit and had to be transferred back to ER. He was evaluated as "opiate OD." [AR 319.] The treatment team thought he might have overdosed on heroin that he smuggled into the hospital when he was admitted. [AR 319, 320.] Later on June 4, he returned to the psychiatric center, where he appeared calm and cooperative. As time passed, Martinez was compliant with his medications and no longer voiced any suicidal ideation. On June 5, he was to be discharged to Healthcare for the Homeless. He was to have sutures removed from his left forearm on June 17. He was ambulatory and took a bus to Healthcare for the Homeless. [AR 316.]

The discharge summary noted diagnoses of substance induced mood disorder, history of opiate dependence, history of cocaine and alcohol abuse, personality disorder, hepatitis C, asthma, intravenous drug use, stab wounds to head and kidney, history of seizures, and chronic substance

abuse.  He was homeless and assessed a GAF of 37.  At discharge, Martinez explained he overdosed on opioids that he brought with him into the hospital so he could get "high" on the unit.  He had hoped to remain in the hospital to expedite his social security disability paperwork.  [AR 313.] Martinez was discharged with prescriptions for Klonopin, Depakote, Methadone, Risperidone, and Trazodone.  UNM had tried to speak with Dr. Murin at the Metamorphosis clinic but was unable to reach the doctor. [AR 312, 313.]

On July 23, 2008, there is a letter from Adrienne Radtke, MSC, LSAA, with Metamorphosis, NM Inc., addressed to whom it may concern.  Ms. Radtke was writing on behalf of Martinez, who had been attending Metamorphosis for four months.  He was engaging in psycho-social rehabilitation group therapy and individual therapy, in addition to taking Methadone.  He was compliant in all aspects of treatment.  Ms. Radtke opined that granting Martinez SSI benefits was in his best interest for a full recovery and a productive life. [AR 120.]

On August 7, 2008, Martinez filled out an adult disability report.  He noted that the contact for him now was "Dr. Tina," who worked with Healthcare for the Homeless.  The illnesses that bothered him were "bipolar/depression, anxiety disorder, PTSD/panic attacks."  He could not remember things and tended to cry easily.  His moods changed a lot, and he felt "panicky" around people. [AR 190-91.] He first started having these problems in 1998, when he began forgetting job duties and feared hurting himself or another.  Martinez claimed that he stopped working in 1998 because of his mental health, but it is questionable if this date is correct.  He states in other records that he worked off and on through 1993.  It also appears he was incarcerated in 1999.

At this time, Martinez was seeing a counselor at Healthcare for the Homeless.  He was trying to qualify for transient housing.  He had attempted suicide one month ago when he admitted to a mental health ward for four days. [AR 193.] He was homeless and staying either in shelters or on

the street. [AR 194.] He previously had tried to commit suicide by overdosing and by cutting his wrist.  The illnesses that prevented Martinez from working were: bipolar disorder, anxiety, chronic depression, psychotic thoughts, panic attacks, suicidal ideation, bad back pain, abdominal pain, and kidney pain.  Martinez stated he obtained his G.E.D. in Grants (prison). [AR 197-99.] He further stated: "I'm homeless.  I'm going through a lot of counseling.  I'm trying to better my life.  I need SSDI.  I can't work." [AR 200.]

On July 25, 2008, an ALJ hearing was held, at which Martinez was present with his attorney. [AR 338-340.] Martinez testified that he was single (as opposed to having a wife who recently left him). [AR 342.] He received food stamps, and general assistance benefits in the amount of $260. He used Good Shepherd as his mailing address.  He had been staying in shelters or on the street for the last seven months. [AR 342.] He was only allowed to stay at Good Shepherd for seven nights. in a row.  He ate meals at shelters when he could and obtained clothing through shelters.  He kept moving around to avoid being ticketed for criminal trespass.  He weighed about 120 pounds. [AR 342-45.]

Martinez went to Healthcare for the Homeless and saw "Dr. Tina," a psychiatric social worker. [AR 346.] He saw Dr. Tina about once a month or more, and also attended group counseling at Metamorphosis. [AR 346-47.] He obtained Methadone through Metamorphosis and had done so for four months.  He claimed not to have used drugs during that period[26] and that he was reducing his use of Methadone.  He testified that the Methadone program was difficult but he was trying not to use heroin. [AR 347.] He had not had any relapses since he started Methadone. [AR 348.]

---

[26]This cannot be true since in June he was hospitalized for suicide attempts and clearly, abused drugs even while in the hospital.

24

Martinez also saw a counselor at Metamorphosis, who he had been seeing once a week for four months. [AR 348-49.] He was going to an "Awakenings" program once a month and was trying to get into the CASA program.  The other program he attended was "ROPEs" out of St. Martin's. If he stayed off drugs for a month he could be moved into an apartment. [AR 350.]  Martinez claimed he did not buy any illegal drugs with General Assistance funds he had been receiving for eight months, but he did use the funds to pay for Methadone. [AR 353.]

Martinez had been hearing voices since he had been in prison in 2000-2001. [AR 353-54.] On the occasions when Martinez attempted suicide, he heard voices telling him to do it. [AR 356.]

He was incarcerated in the 1990's for sleeping in a car, after which he was charged with auto burglary. [AR 354.] He claimed never to have been to prison for drug-related crimes but other records indicate he was in prison for dealing drugs.

With respect to drinking, Martinez testified that he used to drink a lot, but that he did not drink "much" currently.  He had no money to drink.  He had worked in the kitchen at a community center in Española, but he no longer worked there. [AR 358-59.]

Martinez did not believe he could do any type of light work.  He could not concentrate.  He still had mood swings, depression, and nightmares. [AR 359-364.]

The ALJ presented a hypothetical question to the VE at the hearing, wherein the VE was to assume Martinez was closely approaching advanced age, had his G.E.D., had no prior relevant work, and could perform a limited range of light work, with moderate limitations in his ability to socially function in an appropriate manner.  Martinez could not perform work in which the primary focus was interaction with the public.  Based on the hypothetical and limitations, the VE testified Martinez probably could perform some type of housekeeping work, where contact with people would be

limited.  In addition, the VE believed that Martinez could perform work as a packer and a dining room attendant.   [AR 366.]

Martinez's attorney asked the VE to add a similar moderate limitation in Martinez's ability to accept instructions and respond appropriately to criticism from supervisors.  The VE testified that the additional limitation would significantly erode the jobs Martinez could perform.  Because the identified positions were unskilled, Martinez probably could not do those jobs if he could not accept supervision. [AR 368.]

At this time, the ALJ did not have the recent UNM hospital records describing Martinez's suicide/overdose attempt.  The attorney was going to provide them to the ALJ. [AR 368.]

On August 12, 2008, Martinez saw "Dr. Tina" at Healthcare for the Homeless.  The record notes that Martinez was released from UNMH that morning after being admitted for three days with pneumonia.  Martinez was taking Risperdal, Seroquel, and Benztropine Mesylate.[27]  He was assessed with GERD, constipation, Opioid dependence, bipolar affective disorder, mixed, PTSD, chronic, and bipolar I mixed (most recent episode mild).   His mental status exam indicated a flat affect, cooperative attitude, depression, fair insight and fair judgment.  Martinez requested a medical bed. He was down to 110 pounds.  He continued to reduce the Methadone from 80 mg to 50 mg.  He had no appetite while detoxing and was very emaciated.  He still needed a medical provider.  Martinez was concerned that his hepatitis was "kicking up" again.  He also complained of pain in the abdomen, back, and legs.  He was noted as "medically compromised" and referred to a primary care physician to evaluate him for a medical bed.  [AR 306.]

---

[27]"Benztropine is used to treat symptoms of Parkinson's disease or involuntary movements due to the side effects of certain psychiatric drugs (antipsychotics such as chlorpromazine/haloperidol)."  www.webmd.com

There is another medical record filled out by "Dr. Tina" on August 12, 2008, that contains a little more detail. This records states Martinez was on and off the street for three years. He currently was trying to get into the ROPEs program. He was taking 80 mg. of Methadone and was on the "premier care voucher" for four months. He did not know what he would do after that, but hoped to get a voucher through DVR. Martinez denied using any street drugs or alcohol at the time. He stated he had been "clean" since February 2008.[28] "I'm tired. I'm done with it." He appeared ill, very depressed, and very emaciated. He was fatigued and throwing up a lot. He was not sleeping much and had not eaten in two days. His thoughts were linear and logical, well-organized. He had a productive cough but had not been seen by a medical or psychiatric provider for a long time. He had been living in Espanola and Santa Fe. He had lost 25 pounds in four months. He had been hearing voices since his father committed suicide when Martinez was 10 years old. [AR 308.]

Recently, Martinez had been hospitalized at UNM for cutting his arms. This occurred after he bought Xanax on the street and used it. He had moved to Albuquerque because he could not get social/medical services in Santa Fe. Martinez suffered from severe nightmares, flashbacks, paranoia, and severe mood swings. He was assessed with schizoaffective disorder, PTSD, opiate dependence, and Hepatitis C. His GAF was 45. He weighed 111 pounds. [AR 308.] At this time, Martinez was taking Thorazine[29] but did not like the side effects. He suffered from abdominal pain and requested suture removal from a laceration wound to his left forearm. He complained of anhedonia, depression most of the day, decreased pleasure in life, decreased energy, recurrent thoughts of death, and suicide. He also complained of diminished mental capacity, difficulty

---

[28]Again, this cannot be true based on hospital records from June 2008.

[29]"Chlorpromazine ( Thorazine ) is an antipsychotic drug of low-potency used to treat schizophrenia. Chlorpromazine ( Thorazine ) is used in the treatment of disorganized and psychotic thinking. Also used to help treat false perceptions (e.g. hallucinations or delusions)." www.PSYweb.com

concentrating, and difficulty making decisions.  His drug of choice was opioids which he used orally. [AR 310.] Opioid dependence was a diagnosis.

On August 18, 2008, Martinez was seen at Healthcare for the Homeless by Karen Nunez. She noted that Martinez was in the hospital last night.  He weighed 108 pounds. [AR 300.] He was taking Risperdal, Seroquel, Benztropine Mesylate.  They added Omeprazole, Neurontin and Trazodone.  His current problems were GERD, constipation, opioid dependence, bipolar affective disorder mixed, PTSD chronic, and bipolar 1 (most recent episode mild).  He had a new problem which was diagnosed as peripheral neuropathy NOS.  He came to the clinic for treatment of pneumonia although he was feeling slightly better today.  He complained of burning sensations in his feet and back pain.  He had reduced the Methadone to 50 mg.  He looked slightly better.  His lungs were clear, and his feet were healing from blisters to the soles. [AR 300-01.]

On August 28, 2008, the ALJ issued a written decision, concluding that while Martinez was disabled, substance abuse was a contributing factor material to the determination.  Thus, he was not under a disability. [AR 10-19.]

On September 8, 2008, Martinez's attorney submitted a letter to the Appeals Council with attachments of UNM records from 2008.  Martinez requested a list of exhibits that complied with HALLEX. [AR 297.]

### *2009 Records*

On March 25, 2009, Martinez's attorney wrote to the Appeals Council again, arguing that page 68 of the exhibits did not provide substantial evidence of the RFC Martinez would have if there was total abstinence from substance use/abuse. [AR 337.]

On June 25, 2009, the Appeals Council denied the request for review, after reviewing additional records supplied by Martinez and Martinez's attorney's letters. [AR 3-6.]

28

**Martinez's Motion to Reverse or Remand**

Martinez argues that the ALJ's RFC analysis was not supported by substantial evidence. More specifically, Martinez asserted that Dr. Garnand (non-examining physician) found Martinez had additional moderate limitations that the ALJ did not include in the hypothetical to the VE or in his RFC finding.  Moreover, the ALJ did not explain why he failed to address these limitations. [Doc. 18, p. 10.] Martinez also asserted that the ALJ improperly selected and relied on evidence that supported his decision while ignoring evidence to the contrary.  Martinez further challenged the ALJ's decision to afford "less weight" to social worker Ms. Ortiz's opinion because she was not an acceptable medical source. [Doc. 18, p. 11.] Martinez took issue with the ALJ's reliance on Martinez's homeless status as evidence that he could perform light work. [Doc. 18, p. 12.]

In addition, Martinez asserted that the ALJ's "materiality" analysis was contrary to the evidence and law, the ALJ misstated Martinez's burden at step five (in the boilerplate portion of the ALJ's decision), and failed to include a proper list of exhibits in the decision. [Doc. 18, p. 16.]

**Discussion**

**A.      Drug Addiction and Alcoholism Legal Standard**

The Contract with America Advancement Act of 1996, Public L. No. 104-121, 110 Stat. 847, provides in part that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).  "The ALJ must find plaintiff not disabled if alcoholism or drug addiction is a contributing factor material to his disability determination." Bainer v. Barnhart, 2004 WL 2009426 at *3 (D. Kan. Aug. 19, 2004) (citing 42 U.S.C. § 423(d)(2)(C)).  The key inquiry is whether the

plaintiff would still be disabled if he stopped using drugs or alcohol.  Id.; 20 C.F.R. § 404.1535(b)(1).

A two-step analysis is required to determine whether drug addiction or alcoholism is a contributing factor material to a determination of disability.  First, the ALJ assesses which of the claimant's limitations would remain if he stopped using drugs or alcohol.  Id.  Second, if the ALJ decides that the claimant's remaining limitations would not be disabling, his drug addiction or alcoholism is then considered a contributing factor material to the disability determination.  Id.  But if, the claimant's remaining limitations are still disabling, the drug addiction or alcoholism is not a contributing factor material to the disability determination.  Id.  Under the latter scenario, the plaintiff then would be found disabled, independent of his addictions.  Id.

In Salazar v. Barnhart, 468 F.3d 615, 623 (10th Cir. 2006), the Tenth Circuit Court of Appeals discussed the two-step analysis when mental impairments are involved.  The opinion refers to a Teletype issued by the Commissioner pertaining to "situations where a claimant has one or more other mental impairments in addition to [drug and alcohol addiction.]"  Id.  (See Cox, Dale, Social Security Administration, Emergency Teletype, August 30, 1996.)  The Tenth Circuit noted that the Teletype:

> . . . stresses the need for careful examination of periods of abstinence and also directs that if the effects of a claimant's mental impairments cannot be separated from the effects of substance abuse, the [drug and alcohol addiction] is *not* a contributing factor material to the disability determination.

Id. (emphasis in original).

The Teletype also states:

> The most useful evidence that might be obtained in [cases of multiple mental impairments combined with drug and alcohol addiction] is that relating to a period when the individual was not using

30

> drugs/alcohol.  Of course, when evaluating this type of evidence, consideration must be given to the length of the period of abstinence, how recently it occurred, and whether there may have been any increase in the limitations and restrictions imposed by the other mental impairments since the last period of abstinence.

Id.

The Teletype further indicates that the report of a medical or psychological consultant could be the basis for a conclusion that drug or alcohol addiction is material to the determination that a claimant is disabled if the consultant is able to separate the effects of mental impairments from those of substance abuse and project what limitations would remain if the claimant stopped using drugs or alcohol.  The Commissioner's Teletype instructs that where the record is devoid of any medical or psychological report, opinion, or projection as to the claimant's remaining limitations if he stopped using drugs or alcohol, an ALJ should "find that [drug and alcohol addiction] is not a contributing factor material to the determination of disability."  Id. at 624.

**B.    Analysis**

*1.    ALJ's Written Decision and Citations*

In this case, the ALJ found that Martinez had severe impairments of IV drug addiction, alcohol abuse, personality disorder with antisocial traits, depression, and anxiety disorders. [AR 12.] The record is replete with evidence that Martinez is a long-term drug and alcohol abuser and addict. This is so notwithstanding Martinez's denial of drug use or his protestations that he is "clean and sober."  There are multiple diagnoses of his opiate dependencies, and the ALJ appears to be drawing conclusions that if Plaintiff's stopped using heroin, cocaine, and various benzodiazepines, Martinez's marked limitations would cease and he would not be disabled.  While this conclusion may seemingly flow from the fact of drug addiction, applicable law simply does not allow the ALJ to make that conclusion without supporting medical evidence.

31

Clearly, this is a case where the claimant has both mental impairments and substance abuse issues. Thus, the drug addiction and alcoholism analysis is pertinent. (*See* analysis *infra*).

The ALJ determined that these severe impairments met three separate listings – 12.04, 12.06, and 12.09. [AR 13.] In so doing, the ALJ found that Martinez had two areas of "marked" limitations, thereby satisfying requirements of listings. Thus, at step three, Martinez was considered "disabled."

While Plaintiff does not challenge the ALJ's findings of "marked" impairments, it is worth noting that none of the objective medical evidence supports findings of "marked" impairments. No examining or non-examining physician concluded that Martinez suffered from "marked" limitations., nor does the ALJ cite any record evidence in support of the findings. Thus, it is unclear how the ALJ reached the determination that Martinez suffered from "marked" impairments. While the findings of marked impairments may have been drawn from the evidence of longstanding drug use and abuse, the law mandates that medical evidence or medical opinion specifically support such a conclusion.[30] [AR 13, ¶ 3.] *See* Cagle v. Astrue, 266 F. App'x 788, 796 (10th Cir. Feb. 25, 2008) (noting that where physicians' exertional or postural limitations were not supported by objective medical evidence limitations, the ALJ need not assign controlling weight to doctor's limitations); Lopez v. Apfel, 131 F.3d 152 (Table, Text in Westlaw), 1997 WL 758831, at *1 (10th Cir. Dec. 9, 1997) (unpublished opinion) (controlling weight given to physician's opinion if the "nature and severity of the claimant's impairments . . .  is well supported by medical evidence and "is not inconsistent with other substantial evidence in the record . . . .").

---

[30]Later, the ALJ noted that Martinez had marked "difficulties" in social functioning, and cited "Exhibit F/23." [AR 14.] It is difficult to determine how that record [AR 274] supports a finding of "marked difficulties." The record describes, *inter alia*, Martinez's diagnoses, antisocial personality traits, and a diagnostic impression of "psychosocial stressors - mild to moderate."  However, the clinician did not mention any "marked difficulties."

32

After finding that the severe impairments met listing requirements, the ALJ stated that Martinez's "symptoms are directly related to his continued substance abuse and would be lessened if he discontinued the use of drugs and alcohol." [AR 13.] The ALJ cites "Exhibit 65," which apparently meant Exhibit F, page 65.  This corresponds to AR 217.[31]

The Court did not locate any objective medical evidence in the administrative record that supports the ALJ's contention or supposition that Martinez's symptoms or mental impairments were "directly related to his continued substance abuse and would be lessened if he discontinued the use of drugs and alcohol."  The record at AR 217, relied upon by the ALJ, is the second page of a January 11, 2008 medical note written by Dr. Strassman, who observed that Martinez had seizures from head stabbings, slightly "mumbled" speech due to missing teeth, poor eye contact and some body odor, slightly depressed mood, normal speech and no evidence of a thought disorder.  Martinez was alert, oriented in all spheres and had average intelligence.  He was diagnosed with "bipolar by history, now mostly depressed, polysubstance abuse/dependence, in unknown state, PTSD, by history, panic disorder with agoraphobia, psychosis, need better clarification." [AR 217.] Dr. Strassman wrote prescriptions for or gave samples of VPA, Amitriptyline, Risperdal and Klonopin. The first page of the medical record indicates Martinez had lost 40 pounds in the last year, was hospitalized, had overdosed, had been prescribed many medications, and had frequent panic attacks. Although Martinez stated he was not taking IV drugs and was on Methadone treatment, it was not

---

[31]The Commissioner argues that the ALJ properly identified the evidence of record in this case and that the ALJ was not required to provide a detailed exhibit list as described in the HALLEX procedure manual. [Doc. 19, pp. 10-12.] The Commissioner further explains that the ALJ's office is allowed to streamline the processing of backlogged cases by sequentially numbering the pages in each section of the record instead of preparing a detailed exhibit list. [Id., p. 11.] The ALJ's failure to provide a detailed exhibit list makes it most difficult for the Court to determine what evidence upon which the ALJ relied.  It also forces the Court to look up the exhibit and page numbers, which were not always numbered sequentially, and then match them with the administrative record page number to determine what the ALJ actually reviewed.  The resulting process is unwieldy, and the Court is not convinced that this shortcut actually allowed the ALJ to hear Martinez's case "much sooner than he otherwise would have been able to . . . ." [Doc. 19, p. 11.]

at all clear to Dr. Strassman whether or not Martinez had ceased his polysubstance abuse ("unknown state"). [AR 216-17.]

The ALJ repeated the same supposition on page 5 of his decision [AR 14] – "the claimant's symptoms are directly related to his continued polysubstance abuse and would be lessened if he discontinued the use of drugs and alcohol." This time, the ALJ cited "Exhibit 68," apparently meaning Ex. F, page 68 [AR 214.]

This medical record reflects another appointment with Dr. Strassman in March 2008. The record notes that Martinez had been working 50 hours of community service at a senior center and that he was "eschewing drugs and alcohol." The doctor observed that Martinez "seem[ed]" to be taking 6 mg Risperdal and doing fine on it. He was not hearing voices. The other notation on the record by Dr. Strassman was: "smells a little of alcohol? Doing pretty well. Drinking?" [AR 214.]

It is unclear how this record supports a conclusion that Martinez's symptoms were directly related to continued polysubstance abuse and would be lessened if he ceased use of drugs and alcohol. Dr. Strassman's notation said nothing about whether Martinez's polysubstance abuse affected other mental impairments or symptoms.

The ALJ then found that all of Martinez's mental impairments (major depression, anxiety, personality disorder) were exacerbated by substance abuse. [AR 14.] If the substance abuse ceased, these impairments "would result in more than minimal functional limitations in concentration, persistence, and pace but would permit the performance of basic work-related activities in the national economy." [AR 14.] While the conclusion appears to flow naturally from the record of ongoing serious drug abuse, the requirement remains that medical evidence or testimony form the basis of such a finding. No doctor testified or opined that Martinez's mental impairments would

34

improve if he stopped abusing drugs.  The ALJ provided no citation to the record to support this finding, nor did the Court locate any such record.

Similarly, the ALJ concluded that if Martinez ceased substance abuse, his impairments, while severe, would no longer meet a listing.  As support, the ALJ stated "I . . . am convinced that the claimant's impairments are not attended with the signs and findings necessary to meet any listed impairment." [AR 15.] Common sense might support that conclusion, but again, there are no citations to the objective medical evidence for the ALJ's conclusions.

Thus, the findings have traveled almost full circle – from a finding that the mental impairments were severe and met listings and that Martinez was disabled, to a determination that if Martinez ceased substance abuse, his mental impairments were still severe, but did not meet listings.  The problem with the findings is the absence of objective medical evidence.

The Court recommends remanding this case on several different grounds (*see* discussion *infra*).  Upon remand, the ALJ should provide specific references to the objective medical evidence upon which he relies, or if medical evidence is lacking, appropriate steps should be taken to supplement the record with objective medical evidence.  If the medical records are equivocal, the ALJ should explain why the evidence supports the findings or should re-contact the health care provider for additional clarification.

### 2.    *RFC Finding*

The Court concludes that this case should be remanded because the conclusions lack objective evidentiary support and the RFC was not supported by substantial evidence.  In addition, the ALJ failed to explain why he rejected moderate limitations found by the non-examining physician.

The ALJ determined that if Martinez ceased abusing alcohol and drugs, he "would have the RFC to perform a limited range of light work with moderate limitations in interaction in appropriate manner and unable to perform work focusing upon interaction with others." The finding is somewhat awkward and difficult to decipher. Presumably, the ALJ intended to convey that Martinez could perform a limited range of light work with moderate limitations in his ability to interact appropriately in social settings and with some degree of limitations (moderate?) in his ability to interact with others.

The ALJ stated this conclusion was supported by "the medical evidence of record and the objective findings of mental status examination performed on February 28, 2006 by Dr. Valette." [AR 15.] The ALJ further explained that Dr. Valette's "narrative report" supported his conclusion that Martinez had personality and affective disorders "directly related to his continued use of polysubstances." [AR 15-16.] "It is my [the ALJ's] opinion that symptoms would greatly decrease with discontinuance of drugs and alcohol." [AR 16.] Once again, the ALJ cites to very little if any objective medical evidence in support of this opinion.

Dr. Valette provided a consultative mental examination of Martinez in February 2006, almost 2½ years before the ALJ hearing in July 2008. As of February 2006, Martinez complained of depression, inability to concentrate, and forgetfulness. [AR 272.] He could do some basic house work but did not like to be around people. He denied using alcohol or drugs then but admitted being arrested twice for dealing drugs and having served jail time. He was taking Risperdal, Amitriptyline, Depakote and Advair, but did not know if the medications helped. He felt his depression interfered with his ability to work and his anxiety made him "jumpy, angry, irritable." [AR 273.]

Dr. Valette's diagnostic impressions were cannabis abuse, full remission by report, major depression, generalized anxiety disorder, nonspecific personality disorder with antisocial traits,

36

seizure disorder by report, psychosocial stressors, mild to moderate. [AR 274.] Dr. Valette believed Martinez could handle his own funds but he did not comment on Martinez's ability to work or whether substance abuse affected his mental impairments.

Thus, there is little to no support in this medical report for the ALJ's opinion that Martinez's symptoms would greatly decrease with discontinued substance abuse.[32]  It was not clear from the report if Dr. Valette believed Martinez was abstaining from substance abuse.  Supposedly, Martinez was not abusing alcohol or drugs at this time, yet he was still severely depressed and anxious, even with medications.   Indeed, there are a number of medical records confirming that Martinez consistently complained of depression and anxiety and that he was prescribed many medications in the attempt to alleviate his mental health impairments.

The ALJ's opinion about Martinez's symptoms is unsupported.  An ALJ cannot substitute his own medical opinion for that of a physician.  Hamlin v. Barnhart, 365 F.3d 1208, 1221 (10th Cir. 2004).  Because of the absence of medical evidence that cessation of drug use would improve Martinez's mental impairments, it is likely that the ALJ substituted his own opinion to that effect.

For example, he relies on an October 3, 2005 questionnaire filled out by a psychiatric nurse, where Martinez was diagnosed with bipolar disorder and anxiety and found to be disabled for 9-11 months.  [AR 237.] The form questionnaire asks what symptoms or problems needed to be alleviated in order for Martinez to be employable.  The nurse wrote: improved sleep, management of anxiety symptoms, improved depressed mood, improved concentration, and improved energy/motivation. However, the ALJ interpreted this record to indicate that Martinez was expected to improve with

---

[32]In the Commissioner's response brief [Doc. 19, p. 6], he argues that "Dr. Valette's report indicated that, absent substance abuse, Plaintiff had good functioning consistent with the ability to do work (Tr. 260-62)."  The citation is to the entire report, rather than a single page of the report where this type of language might be found. The Court does not find that Dr. Valette's report "indicates" what the Commissioner states it does.  The report says nothing about what Martinez's level of functioning might be "absent substance abuse." [AR 260-62.]

better sleep, etc.  The nurse's comments appear more akin to goals for Martinez in the hope that he might improve.

The nurse also noted that Martinez had a history of mood instability and depression with significant anxiety.  He had a positive response to medication in the past but "has had significant psychosocial stress–destabilization so will need time to find effective treatment." [AR 237.]  The ALJ interpreted this to mean Martinez had responded positively to medication in the past and further found that "with any medical condition requiring medication for its control, a stabilizing effect is expected to occur with adherence to treatment regimen." [AR 16.] This is, again, impermissible medical opinion or, at best, unsupported speculation by the ALJ.

None of the few records relied upon by the ALJ discuss how Martinez's substance abuse affected his mental health diagnoses.  In addition, none of the records confirm that Martinez actually abstained from alcohol or drug use for any length of period, such that it could be determined how his alcohol/drug use affected his other mental impairments.  While it is true that Martinez continually represented that he was not using drugs, the weight of evidence is to the contrary.

Instead, the ALJ relied on testimony from Martinez that he was able to navigate his way through the system in finding shelter at night, a place to bathe, food, and clothing.  The ALJ concluded that Martinez's ability to find a shelter demonstrated his depression or anxiety did not significantly limit his ability perform daily tasks and that his hallucinations did not adversely affect his ability to perform some type of work.  [AR 17.] The ALJ's reliance on Martinez's abilities to find shelter as a homeless person is improper.  *See* Cooper v. Bowen, 707 F. Supp. 260, 264 (N.D. Tex. 1989) ("the activities of a homeless person such as Plaintiff are not proof of the ability to perform light work.")

38

Unlike the ALJ's analysis in Martinez, the federal district court, in <u>Tucker v. Astrue</u>, 2009 WL 2922044, *7 (D. Ida. Sept. 8, 2009) (unpublished), relied on evidence of homelessness to show the claimant suffered from a "high level" of limitations as to his daily activities.

> [I]t is important to note that Petitioner is homeless and has been living on the streets in Spokane and Coeur d'Alene for at least seven years. This fact in and of itself suggests a level of limitation with regard to activities of daily living well-above the "mild" range found by the consultants. In addition, there is evidence in the record that Petitioner does not engage in any social, community, or recreational activities. He does not go to the movies, engage in sports activities, go to church, or involve himself in any sort of clubs or other social activities. He does not like to be around people and avoids them, even at the shelter, where he sleeps only when it is too cold to camp. He does not have contact with his previous wives or children and has a relationship with only one sister from his biological family and only upon her effort. He does not bathe or comb his hair regularly, has difficulties with authority, and cries a lot. In terms of his daily activities, he typically walks up and down the streets, sleeps in the woods, and gets two meals at the shelter.  All of these facts suggest a high level of limitation with regard to activities of daily living.

Based on slim medical evidence along with Martinez's ability to find shelter and food on the street, the ALJ concluded that Martinez could perform light level exertional work with moderate functional limitations in social, occupational and educational areas. [AR 18.] The district court's approach in <u>Tucker</u> is far more appropriate than the reliance on Martinez's efforts to find shelter and food as evidence of his ability to perform work.

Here, the ALJ stated that absent alcohol or drug abuse, Martinez would have mild restrictions on daily living activities, moderate difficulties in social functioning, and mild difficulties in his ability to concentrate and persist, etc. [AR 15.] However, Dr. Garnand, the state agency non-examining physician found moderate limitations in the following areas: Martinez's abilities to understand and remember detailed instructions; carry out detailed instructions; work in coordination with others without being distracted by them; interact appropriately with the general pubic; accept

39

instructions and respond appropriately to criticism from supervisors; and get along with coworkers without distracting them. [AR 255-56.] The distinction between the "moderate to mild" limitations could be explained by medical testimony relating to drug use and its effects.  However, no medical evidence currently supports the ALJ's conclusion.

During the ALJ hearing, the ALJ did not include all of these limitations in his hypothetical to the VE.  Instead, the hypothetical included limitations that Martinez could perform a limited range of light work with moderate limitations in his ability to socially function in an appropriate manner, such that he could not perform work where the primary focus included interaction with the public. [AR 365.] Under this hypothetical, the VE testified that Martinez could "probably" do some type of housekeeping work, or work as a hand packer or dining room attendant. [AR 365-66.]

When Martinez's attorney asked the VE to consider a moderate limitation in the ability to accept instruction and to respond appropriately to criticism from supervisors, the VE testified that such limitations would probably eliminate Martinez from being able to do the jobs identified by the VE. [AR 367-68.] These additional limitations were supported by the record and indeed, Dr. Garnand assessed Martinez with more moderate limitations than those presented by Martinez's attorney to the VE.  Yet, the ALJ did not include those limitations to the VE in his hypothetical, and did not include the limitations in his RFC finding.  He did not mention Dr. Garnand's restrictions, explain why he disregarded those restrictions, or state whether he found the restrictions unsupported by the record.  This is not consistent with the fact finder's obligations.  *See* Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991) ("[t]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the [Commissioner's] decision.")

Some of the facts in <u>Confere v. Astrue</u>, 235 F. App'x 701, 2007 WL 1196520, *2 (10th Cir. Apr. 24, 2007) (unpublished) are similar to those in Martinez's case.  In <u>Confere</u>, like Martinez, there were two hypothetical questions presented to the VE.  The first hypothetical tracked the RFC that the ALJ ultimately selected.   The second hypothetical contained additional limitations, including marked and moderate limitations found by a non-examining physician. The VE concluded that the claimant could perform several sedentary jobs based on the restrictions in the first hypothetical, but that there were no jobs the claimant could do, based on restrictions in the second hypothetical.  <u>Id.</u>, *3.  The ALJ selected the RFC that he used for the first hypothetical that included some, but not all, of the limitations identified by physicians.  The ALJ did not reference the VE's testimony regarding the second hypothetical, and did not reflect that there was any evidence he rejected.  The Court found this was error because the ALJ "must discuss the uncontroverted evidence he chooses not to rely on, as well as significantly probative evidence he rejects." <u>Id.</u> at *3 (<i>citing</i> <u>Threet v. Barnhart</u>, 353 F.3d 1185, 1190 (10th Cir. 2003) (internal citation omitted)).  In <u>Confere</u>, the Court concluded that the ALJ should have set forth the reasons for rejecting portions of the uncontroverted evidence.  <u>Id.</u> So, too, here.  The ALJ is required to explain why he rejected some of the moderate limitations Dr. Garnand identified, especially, when the VE's testimony regarding some of these limitations might have lead to a finding of disability.

In <u>Grotendorst v. Astrue</u>, 2010 WL 1049791, *5(10th Cir. Mar. 22, 2010), the Tenth Circuit reversed the district court's affirmance of the ALJ's denial of benefits.  The Circuit Court found in part, that the hypothetical questions posed to the VE "must reflect with precision all-and-only-the impairments and limitations borne out by the evidentiary record." (<i>quoting</i> <u>Decker v. Chater</u>, 86 F.3d 953, 955 (10th Cir.1996)).  In <u>Grotendorst</u>, despite record evidence of limitations due to mental impairments, the ALJ failed to include those limitations in the RFC determination and the

41

hypothetical questions.  Furthermore, the ALJ did not explain that omission and did not even mention the physician's examination in the decision.  <u>Id.</u>  This was error that required remand.

The Court concludes that for all of the above-stated reasons, this case should be reversed and remanded so that the ALJ can properly assess Martinez's RFC in accordance with the pertinent law and regulations.  Based on this recommendation, the Court need not address Martinez's remaining arguments regarding remand.  However, because the drug abuse and addiction analysis is an integral part of this case and because the Court finds the ALJ's materiality analysis is flawed, the Court recommends remand on this ground as well.

### 3.       *Drug Addiction and Alcoholism - Contributing Factor*

The ALJ's drug addiction and alcoholism analysis in this case is inadequate.  The key inquiry is whether the records demonstrate that the claimant would still be found disabled if he stopped using drugs or alcohol.  If so, then the alcohol or drug abuse is not a contributing factor material to the finding of disability.[33]

The ALJ continually speculated that "if the claimant stopped substance abuse," he essentially would be able to perform work.  In other words, his severe mental impairments of personality disorder with antisocial traits, depression and anxiety disorders would not interfere with his ability to perform certain work.  The problem is that the ALJ's speculation about Martinez's cessation of alcohol or drug abuse is just that – speculation.

------------------------------------------------------------

[33]Before reaching the drug or alcoholism analysis, the ALJ first must find the claimant is disabled.  Here, the ALJ made a finding at step three that Martinez was disabled based on listing requirements.  Yet, he reversed this finding by speculating that if Martinez ceased drug or alcohol abuse, he would not meet the listing requirements.  The finding of disability, under these circumstances, is suspect.  The ALJ might find guidance with respect to the required analysis in the following decisions: <u>Salazar v. Barnhart</u>, 468 F.3d 615 (10th Cir. 2006); <u>McGoffin v. Barnhart</u>, 288 F.3d 1248 (10th Cir. 2002); <u>Drapeau v. Massanari</u>, 255 F.3d 1211, 1213 (10th Cir. 2001); and <u>Archer v. Astrue</u>, 2009 WL 1974241 (D. Colo. Jul. 6, 2009) (unpublished); <u>Stuart v. Barnhart</u>, 2003 WL 1054014 (D. Kan. Deb. 24, 2003) (unpublished)..

Save for Martinez's own professions that he was drug free, no medical record confirms that medical providers determined he stopped abusing drugs or alcohol for any significant period, if for any period at all.[34]  Medical care providers did not discuss any definite periods of abstinence by Martinez and did not necessarily believe self reports of cessation.

In <u>Salazar</u>, the Tenth Circuit stressed the need for careful examination of periods of abstinence.  <u>Salazar</u>, 468 F.3d at 623.  When a claimant's mental impairments cannot be separated from the effects of substance abuse, the most useful evidence to obtain is that relating to a period of abstinence.  Even then, careful attention is given to the length of the period of abstinence, how recently it occurred, and whether there may have been any increase in the limitations and restrictions imposed by the other mental impairments since the last period of abstinence.  <u>Id.</u> (*citing* the Commissioner's Teletype).

The ALJ did not mention the Commissioner's Teletype or any part of it.  While that may not be fatal, <u>Salazar</u>,468 F.3d at 624, the ALJ did not identify a single period of abstinence so as to evaluate the effect of Martinez's alleged cessation of drug and alcohol abuse on his other mental impairments.  Without such evidence in the record, it is impossible to assess the complicated scenario presented by this case, *i.e.,* whether Martinez's drug or alcohol abuse can be separated from the other severe mental impairments.

If a claimant's only impairments were drug and alcohol related, the analysis might be straight forward.  However, the analysis is more complicated where the claimant has other mental impairments in addition to drug and alcohol addictions.

---

[34]The Commissioner argues in his response brief that Martinez had a 'brief episode of remission in February 2006 when he was evaluated by Dr. Brett Valette, Ph.D." [Doc. 19, p. 6.] Dr. Valette's diagnostic impression of "cannabis abuse, full remission by patient report" is not evidence of a "brief episode of remission."  It is merely an unconfirmed self report by Martinez.

43

> The most complicated and difficult determinations of materiality will involve individuals with documented substance use disorders and one of [sic] more other mental impairments. In many of these instances, it will be very difficult to disentangle the restrictions and limitations imposed by the substance use disorder from those resulting from other mental impairment(s).

Stuart, 2003 WL 1054014 at *3 (*citing* Teletype).

The Court determines the ALJ's finding that Martinez would not be disabled in the absence of his drug addiction or alcoholism is not supported by substantial evidence and that reversal is required on this ground as well. Upon remand, the ALJ might find it helpful to utilize a psychological consultant who could attempt to separate the effects of mental impairments from those of substance abuse and project what limitations would remain if Martinez stopped using drugs or alcohol. But in this case, the ALJ should have found that "[drug and alcohol addiction] is not a contributing factor material to the determination of disability" because the record is devoid of any psychological report, opinion, or projection as to Martinez's remaining limitations if he stopped using drugs or alcohol. *See* Salazar, 468 F.3d at 623 (referring to Teletype).

## Recommendation

For all of the above stated reasons, the Court recommends that Plaintiff's motion to reverse and remand be granted, and that this matter be remanded for additional administrative hearings, as described herein.

Lorenzo F. Garcia
United States Magistrate Judge

44